# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **MARK HARVIN,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 3:23cv328 (MPS)** |
| | : | |
| **LT. JASON CHENEY, et al.,** | : | |
| **Defendants.** | : | |

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 84]

The plaintiff, Mark Harvin, is a Connecticut inmate who is now housed within the custody of New Mexico Corrections Department ("NMCD").[1] On March 9, 2023, Harvin filed his civil rights complaint, *pro se*, under 42 U.S.C. § 1983 against several Connecticut Department of Correction ("DOC") officials. Compl., ECF No. 1. Harvin is proceeding on claims of (1) Eighth Amendment violation due to deliberate indifference to his safety and excessive force during his Connecticut DOC confinement at the MacDougall-Walker Correction Institution ("MWCI"); (2) First Amendment retaliation for his prior protected activity; and (3) Eighth Amendment violation due to deliberate indifference to his safety during his confinement at NMCD. Initial Review Order ("IRO"), ECF No. 11.

On August 23, 2024, Defendants filed a motion for summary judgment with a memorandum of law, Local Rule 56(a)(1) Statement, and supporting exhibits. Mot. for Summ. Judg., ECF No. 84; Defs.' Mem., ECF No. 84-1; Defs.' Local Rule 56(a) ("Defs.' L.R.") ECF No. 84-2; Defs.' exs. A-R, ECF Nos. 84-3 to 84-20. On December 26, 2024, Harvin filed his response to Defendants' motion for summary judgment. Pl.'s Opp., ECF No. 91.

---

[1] Harvin was sentenced to twenty-five years of incarceration on January 18, 2019. http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=384835.

For the reasons set forth below, the motion for summary judgment is granted in part and denied in part.

## I.    FACTS[2]

Harvin is a sentenced inmate now housed at a NMCD corrections facility under an interstate compact agreement. Defs.' L.R. at ¶ 1.[3] He was housed at MWCI from June 7, 2021 to February 9, 2022. Defs.' ex. R, Inmate Movement History, ECF No. 84-20. Harvin was transferred to NMCD in late 2022. *See id.*

**Security Risk Group ("SRG") Unit**

MWCI's SRG Unit housed inmates in Phase 1 of DOC's 5-phase SRG program. Defs.' L.R. at ¶ 13. In Phase 1 of the SRG program, inmates of the same SRG affiliation are generally

---

[2] This factual background reflects the Court's review of Defendants' Local Rule 56(a) statements of facts, the parties' supporting exhibits, and Harvin's verified allegations from his complaint. *See Jordan v. LaFrance*, No. 3:18-cv-01541 (MPS), 2019 WL 5064692, at *1 n.1, *4 (D. Conn. Oct. 9, 2019) (a "verified complaint ... may be considered as an affidavit" for summary judgment purposes"); *Walcott v. Connaughton*, No. 3:17-CV-1150, 2018 WL 6624195, at *1, n. 1 (D. Conn. Dec. 18, 2018). The Court will include the facts relevant to Harvin's exhaustion of his administrative remedies in its discussion of the PLRA.

Defendants have informed Harvin of the requirements for filing his papers in opposition to the motion for summary judgment under Local Rule 56. Notice, ECF No. 84-22. Local Rule 56(a)1 provides: "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact." Local Rule 56(a)2 requires that "[a]ll denials must meet the requirements of Local Rule 56(a)3." Local Rule 56(a)3 specifies that "each denial in an opponent's Local 56(a)2 Statement[] must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." Harvin has not filed a statement of facts that complies with Local Rule 56(a). See Pl.'s Opp. at 143-166. Thus, the Court may deem a statement of fact in Defendants' Local Rule 56(a)1 statement to be admitted if supported by evidence. *Patterson v. Quiros*, No. 3:19CV147 (MPS), 2021 WL 681144, at *1, n.3 (D. Conn. Feb. 22, 2021).

[3] Where the facts are not disputed, the Court cites only to the Local Rule 56(a)1 statement. For citations to exhibits, the Court cites to page numbers assigned by the CM/ECF system as reflected in the ECF header and not the page numbers marked on the documents themselves, if any.

housed together and assigned to the same recreation time. *Id.* at ¶ 15.

At the time relevant to this action, Captain Roy was the SRG Unit Manager and had the authority delegated by Warden Barone for housing assignments in the SRG Unit. *Id.* at ¶ 23. Captain Papoosha, Counselor Supervisor Stanley, Lieutenant Cheney, and Correction Officers Brysgel and Nguyen did not have authority over inmate cell assignments in the SRG Unit. *Id.*

**Harvin's Housing with Inmate 1 as Cellmate**

On August 3, 2021, Harvin was housed in MWCI's SRG Unit in cell 67 on the lower tier when Inmate 1, who had the same SRG affiliation as Harvin, transferred into MWCI's SRG Unit. *Id.* at ¶¶ 16, 18. At that time, DOC intelligence indicated that Inmate 1 and Harvin were both high level leaders in their SRG subset. *Id.* at ¶ 18. Captain Roy consulted with Captain Papoosha about housing Inmate 1 and Harvin in the same cell. *Id.* at ¶ 19.[4] In response, Captain Papoosha expressed only a concern that, as high-ranking inmates, Harvin and Inmate 1 might work together to agitate the unit and cause a disturbance. *Id.*

Captain Roy decided to permit Harvin and Inmate 1 to be housed together, and Inmate 1 moved to cell 67 on August 4, 2021. *Id.* at ¶ 20. Captain Roy declares that Harvin did not refuse his housing assignment with Inmate 1 or request protective custody. Defs.' ex. D, Roy Decl. ¶ 17.[5]

---

[4] Captain Roy avers that Harvin and Inmate 1 both made verbal and written requests to be housed in the same cell together. Defs.' ex. D, Roy Decl. at ¶ 11, ECF No. 84-6. But Defendants have not included these written requests as evidence in this action. And such claim is contrary to Harvin's verified allegations he communicated verbally and in writing expressing his safety concerns about being housed with Inmate 1. *See* Compl. at ¶¶ 8-10. In his opposition, Harvin states that "at no point" did he "ever ask or request (Inmate 1) to be placed into [his] cell or to be housed with (Inmate 1) verbally or in written form." Pl.'s Opp. at 54 (emphasis omitted). Accordingly, the Court considers the question of whether Harvin and/or Inmate 1 requested to be housed in the same cell to be a disputed issue of fact.

[5] Captain Papoosha, Counselor Supervisor Stanley, Lieutenant Cheney, Correction Officers Brysgel and

In a recorded telephone call on August 4, 2021, Harvin can be heard telling the female party on the call that he "got a celly now" and "he's my bro." Defs.' ex. P, 8/4/2021 Telephone Call at 6:23 to 6:32. After another male individual joined the call, Harvin can be heard talking with Inmate 1 in the background, conveying information from Inmate 1 to the other male party, and laughing with Inmate 1 and the other male caller. *Id.* at 11:30-14:49. The other male party indicated that Harvin and Inmate 1 should "figure" things out themselves and keep him "posted." *Id.* at 12:17-12:30.

**Assault on September 3, 2021**

On the evening of September 3, 2021, Lieutenants Cheney and McDonald worked on duty as shift lieutenants. Defs.' L.R. at ¶ 26. Officer Brysgel worked at MWCI that evening in the unit next to the SRG Unit, and Officer Nguyen worked at MWCI as a hallway roving officer. *Id.* Warden Barone, Captain Roy, Counselor Supervisor Stanley and Captain Papoosha were not at MWCI that evening. *Id.*

At approximately 9:00 PM, Officer Nguyen entered the SRG unit to escort an inmate to the cell adjacent to cell 67, where both Harvin and Inmate 1 were housed. *Id.* at ¶¶ 27-28. At this time, Officer Matthew Mann (who is not a defendant in this action) was assisting medical staff to pass out medications on the lower tier of the SRG Unit. *Id.* at ¶ 29.

When the door opened for the cell adjacent to cell 67, Officer Nguyen led the inmate into the cell and began to close the door. *Id.* at ¶ 30.[6] As Officer Nguyen was standing in front of the

---

Nguyen aver that they do not recall discussing or receiving any communication from Harvin to alert them of his safety concerns about Inmate 1 prior to September 3, 2021. Defs.' ex. F, Papoosha Decl. at ¶ 14; Defs.' ex. E, Stanley Decl. at ¶ 10; Defs.' ex. I, Brysgel Decl. at ¶ 17; and Defs.' ex. J, Nguyen at ¶ 16.

[6] The following facts concerning Officer Nguyen's conduct are consistent with the surveillance video, Defs.' ex. N at 55:21-56:56. The court cites to the video recording marked as Export-WCI-539-B-2 Unit

4

cell to the side of cell 67, the door to cell 67 opened slightly, and Officer Nguyen caught it with his hand to close it. *Id.* at ¶ 31. He then pushed the door closed again, using his right foot to further secure the cell 67 door. *Id.* Thereafter, he closed the cell door adjacent to cell 67, removed the inmate's handcuffs through the food trap, and left the area. *Id.*

Officer Nguyen avers that he could not see into cell 67 or hear any sound coming from the cell while he was resecuring the door to cell 67. Defs.' ex. J, Nguyen Decl. at ¶ 12. He declares that he never looked into cell 67, never spoke into the cell 67, and never heard Harvin state anything while he was near cell 67. *Id.*

Officer Mann avers that he could not see or hear any commotion coming from cell 67 while he was assisting medical staff with the medication pass on the lower tier in the SRG Unit before he reached the cell adjacent to cell 67. Defs.' ex. K, Mann Decl. at ¶ 6. But after he and the medical staff reached the cell next to cell 67, Officer Mann looked through the window into darkened cell 67. Defs.' L.R. at ¶ 35.[7] He avers that he was then able to observe blood and two figures grappling with each other at the back of the cell. Defs.' ex. K, Mann Decl. at ¶ 7. Officer Mann then called a Code over the radio to alert staff that a physical altercation was taking place. Defs.' L.R. at ¶ 35. He avers that both inmates failed to comply after he gave a verbal command into the cell for the inmates to cease fighting and to lie face down on the floor. Defs.' ex. K, Mann Decl. at ¶ 8.

---

Looking at Day Room_Saturday September 04 202135709 627b134.avi.

[7] The surveillance video shows Officer Mann approach Harvin's cell, look in the window and call the Code at Defs.' ex. N at 59:26 to 59:51.

Officer Brysgel overhead the radio code and arrived at cell 67 shortly thereafter. Defs.' L.R. at ¶ 36.[8] He declares that he could observe a large amount of blood in the cell and both inmates at the back of the cell engaged in an active physical altercation, although the cell was partially obscured in shadow. Defs.' ex. I, Brysgel Decl. at ¶¶ 11-12. He avers that he gave a verbal command for the inmates to cease fighting and to come to the door to be handcuffed, but they ignored his command. *Id.* at ¶ 13.

Lieutenants Cheney and McDonald also responded to the Unit after hearing the Code. Defs.' L.R. at ¶ 37. Cheney declares that the cell had its light off, but he was able to observe a large amount of blood and the two inmates at the back of the cell fighting with each other. Defs.' ex. G at ¶¶ 13, 14. Cheney avers that he assessed that a weapon was involved as there was blood in the cell and that it was not safe to open the door to enter the cell at that time. *Id.* at ¶ 15. He explains that after the inmates failed to follow his verbal command, he dispersed one burst of chemical agent into the facial area of both Harvin and Inmate 1 and issued another order for the inmates to cease the physical altercation and come to the door to be handcuffed. *Id.* at ¶¶ 15-16. The inmates then ceased fighting, with Inmate 1 coming to the door to be handcuffed first, followed by Harvin. Defs.' L.R. at ¶ 42. Once both inmates were secured, Lieutenant Cheney instructed staff to enter the cell and remove both inmates. *Id.*

At some time after the radio code, Officer Nguyen responded and returned to the SRG Unit. *Id.* at ¶ 44.

**Escort and Medical Attention**

Both inmates were escorted to separate areas for medical care, questioning, and further

---

[8] The surveillance video shows the correctional staff response to the Code at Defs.' ex. N at 59:51 to 1:02.

processing. *Id.* at ¶ 45. Lieutenant Cheney supervised Inmate 1's escort, while Lieutenant

McDonald supervised Harvin's escort. *Id.* Lieutenant McDonald instructed staff to record

Harvin's escort with a handheld camera. *Id.* at ¶ 46. Officer Nguyen assisted with Harvin's

escort. *Id.* at ¶ 53.

 Prior to reaching the medical unit, Harvin was squinting and complaining about his

exposure to the chemical agent. *Id.* at ¶ 47.[9] Officers instructed him to continue breathing and

advised that they would get him decontaminated in the medical unit. *Id.* When he arrived at the

medical unit, the correctional officers sat Harvin down and medical staff began assessing

Harvin's wounds and administering care. *Id.* Harvin again complained about being sprayed and

claimed that he was not fighting. *Id.* Harvin then received medical care, including relief for his

exposure to the chemical agent. *Id*. at ¶¶ 47, 53.

 In response to Lieutenant McDonald's questions about what led to the altercation, Harvin

stated: "I don't know. I was minding my fucking business at my desk." *Id.* at ¶ 48. After

Lieutenant McDonald asked if they had been arguing, Harvin responded: "Naw, I was just sitting

at my fucking desk, writing in my phonebook. . . shit just, I don't know, mother fucker is weird,

man." *Id.* Harvin indicated that he did not want to press charges and claimed that he was not

fighting back as he just standing next to the bed. *Id.* Harvin recalled "being at the desk" and that

he could not get Inmate 1 off of him and "I was telling Mann to open the door but I don't think

he heard me." *Id.*

 Harvin indicated that he would not press charges and declined protective custody, stating:

"I'm not in jeopardy, I'm well. It's that simple." *Id.* at ¶ 49. He confirmed he was "cellies" with

---

[9] The following facts concerning Harvin's escort, medical care, and conversations are confirmed by the escort video. Defs.' ex. 0 (Escort Footage), Walk-21-454 at 00:00-12:00; 18:53-19:05.

Inmate 1 since he moved into the unit, stating: "This is new shit to me, weird shit. But I am not trying to press charges, I'm not going on rec alone. My safety is not in jeopardy. I'm good, I'm just confused." *Id.* He also confirmed he and Inmate 1 were the same SRG affiliation. *Id.* When asked if the fight had to do with anything else on the block, Harvin stated: "Honestly, no. I mean, that was my man, so I don't know what the fuck, he weird. I don't know, he's just weird. That was some weird shit. Everything was just good." *Id.* at ¶ 51.

Harvin received a disciplinary report for fighting and pleaded guilty. *Id.* at ¶ 54. DOC staff also issued a security profile between Harvin and Inmate 1. *Id.*

### Telephone Call on September 11, 2021

On September 11, 2021, Harvin spoke again on a recorded call with a female individual who connected the call to another male party. *Id.* at ¶ 55. During the telephone call, Harvin indicated that while he was housed with Inmate 1, the two inmates experienced tension due to conflict about their respective power or leadership roles within their SRG. *Id.*[10]

### Investigation Into Altercation

Captain Papoosha avers that he conducted an investigation because the altercation involved two high-ranking SRG members. Defs.' ex. F, Papoosha Decl. at ¶ 17. He interviewed Harvin and Inmate 1 and reviewed Harvin's prior telephone communications and various draft supplemental reports from staff who responded to the Code. Defs.' L.R. at ¶¶ 56-57. Captain Papoosha could not determine which inmate was the actual aggressor, but he determined that Inmate 1 had used some type of sharp instrument to slash Harvin's face during the encounter. *Id.* at ¶ 56. Captain Papoosha concluded that Harvin and Inmate 1 had requested to be housed

---

[10] *See* Defs.' ex. P, Telephone Call 9/11/2021 at 8:19-10:21.

together; that they were instructed by SRG leadership to work out the ranking structure within their SRG subset; that there was tension between Harvin and Inmate 1 due to disagreements and mistrust over SRG power structure, but they were attempting to put this disagreement aside so as not to upset SRG leadership; and that Harvin communicated in his September 11, 2021 telephone call that Inmate 1 had "crossed a line" and that he (Harvin) was making efforts to organize other SRG inmates under a new subset led by him. *Id.* at ¶ 58; Defs.' ex. F, Papoosha Decl. at ¶ 22.

**Harvin's New Mexico Corrections ("NMCD") Confinement**

Harvin has been confined within the NMCD under the interstate compact agreement since December 2022. Defs.' L.R. at ¶ 74. DOC's Director of the Interstate Compact Office ("ICO") and ICO staff submitted the request for Harvin's out-of-state transfer and had authority over the application and transfer process. *Id.* at ¶ 75. The ICO Director is Commissioner Quiros's designee with authority to handle DOC's interstate compact activities, including managing interstate agreements, submitting transfer applications, and monitoring Connecticut inmates housed in other jurisdictions. *Id.* at ¶ 76. At the time relevant to this action, Captain Papoosha was not an ICO staff member and had no role in the inmate transfer process or the monitoring of inmates housed in other jurisdictions through an instate compact agreement. *Id.*

Under Connecticut's interstate compact agreement with New Mexico, NMCD retains responsibility for managing the inmate's care, safety, and accommodations. *Id.* at ¶ 78. Thus, an inmate from Connecticut DOC is subject to the rules and procedures applicable to New Mexico state correctional inmates in New Mexico. *Id.* at ¶ 77.

In December 2022, ICO staff, Counselor Crespo, sent a letter to Harvin that advised him he had been involuntarily transferred for safety and security concerns and that ICO would be his

liaison. *Id.* at ¶ 79; *see* Defs.' ex. M, Osden Decl. at 11 (Attach. 1). The letter instructed him to send questions or requests to their office and provided him with a copy of the Inmate Handbook for Connecticut Inmates Incarcerated Out-of-State. *Id.*

On February 27, 2023, ICO received a phone call from a private citizen indicating that Harvin had been assaulted in New Mexico and required treatment in a hospital. Defs.' L.R. at ¶ 80. After this call, an ICO staff member sent an inquiry to the relevant NMCD staff member to confirm whether the information from the caller about Harvin's assault and injury was legitimate. *Id.*

On March 13, 2023, ICO received a letter from Harvin requesting to be transferred out of New Mexico and back to Connecticut. *Id.* at ¶ 82. At this time, ICO was communicating with NMCD staff to confirm the information about Harvin's status, ascertain what had happened, and learn about what measures, if necessary, NMCD had in place to ensure Harvin's safety. *Id.*

ICO later received confirmations that Harvin had been involved in an incident that did not appear to be gang related, had received multiple superficial stab wounds but did not require hospital care, and was housed in the general population without incident with separation profiles in place. *Id.* at ¶ 83; *see also* Defs.' ex. M, Osden Decl. at 20 (Attach. 3).

In a letter dated March 15, 2023, Counselor Crespo advised Harvin of the communications with NMCD staff, encouraged him to address his concerns about his safety and conditions of confinement with NMCD staff, and advised him that he did not meet the criteria to be eligible for a transfer back to Connecticut DOC. Defs.' L.R. at ¶ 84; *See* Defs.' ex. M, Osden Decl. at 24 (Attach. 4).

On April 4, 2023, ICO received another letter from Harvin requesting his return to Connecticut due to safety concerns after he had sustained two assaults. Defs.' L.R. at ¶ 85. Counselor Crespo again sent an inquiry to NMCD staff to determine whether Harvin had been assaulted two times as reported. *Id.* s*ee* Defs.' ex. M, Osden Decl. at 29 (Attach. 5).

On April 17, 2023, NMCD staff informed ICO that they were only aware of one assault on Harvin, and that they were looking to relocate him to a new facility so that he could have a fresh start. Defs.' L.R. at ¶ 86. In another letter dated April 17, 2023, Counselor Crespo advised Harvin that ICO had conferred with NMCD staff and was informed that he had sustained only one assault while in NMCD custody. *Id.* at ¶ 87; s*ee* Defs.' ex. M, Osden Decl. at 29 (Attach. 6). She again encouraged Harvin to address his concerns directly with NMCD staff. *Id.*

On May 4, 2023, ICO staff received a communication from NMCD that Harvin's transfer to another NMCD facility was approved and that he should be transferred within ten days. Defs.' L.R. at ¶ 88. On May 24, 2023, ICO received confirmation Harvin had been transferred to the new NMCD facility. *Id.* ICO later received a report dated June 21, 2023 from NMCD, indicating Harvin was housed in general population and was not presenting a management problem. *Id.* at ¶ 89; *see* Defs.' ex. M, Osden Decl. at 31 (Attach. 7).

On September 28, 2023, ICO received a third letter from Harvin requesting information about Connecticut's interstate directives, guidelines, and agreements. Defs.' L.R. at ¶ 90. By letter dated October 19, 2023, Counselor Crespo responded to Harvin and provided him with a copy of the New Mexico contract, a list of contracted states, and a second copy of Connecticut DOC's Inmate Handbook for Inmates Incarcerated Out of State. *Id.* Defs.' ex. M, Osden Decl. at 33 (Attach. 8).

On October 27, 2023, ICO contacted NMCD regarding Harvin's claim made in a motion for temporary injunction filed in this action about rumors being spread that he was a "snitch." Defs.' L.R. at ¶ 91. NMCD staff informed ICO that Harvin had settled into his new facility well and was housed in general population (aside from a temporary stay at that time in restrictive housing due to a disciplinary action), and that there had been no issue regarding "snitch" rumors or any reason to place Harvin in protective custody or other alternative safety measures. *Id*. at ¶ 92.

In January 2024, ICO learned that Harvin had claimed in a court filing that NMCD had no separation profile in place relevant to the inmates who had assaulted him in 2023. *Id.* at ¶ 93. Osden declares that she received visual confirmation of a profile between Harvin and the other inmates in NMCD custody. Defs.' ex. M, Osden Decl. at ¶ 23.

More recently, in June 2024, ICO received a report from NMCD indicating Harvin remained in general population and held a job as a "pod porter." Defs.' L.R. at ¶ 94. While the report noted recent disciplinary actions for fighting and other misconduct, it indicated that Harvin was not considered to pose any management problem. *See* Defs.' ex. M, Osden Decl. at 38 (Attach. 10).

New Mexico uses many of the same measures as Connecticut DOC to safeguard inmates, if necessary. Defs.' L.R. at ¶ 95. Osden declares that ICO received no other communications from Harvin or NMCD to suggest Harvin remains at risk of harm in the custody of NMCD or that its staff is incapable of adequately protecting Harvin from harm. Defs.' ex. M, Osden Decl. at ¶¶ 26-28.

Neither Captain Papoosha nor Commissioner Quiros have a recollection or a record of receiving any correspondence from Harvin regarding his conditions of confinement in New Mexico; and any such correspondence from Harvin would have been forwarded to ICO as the entity with oversight authority over his complaint. Defs.' L.R. at ¶ 97.

## II.    STANDARD OF REVIEW

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(a), Fed. R. Civ. P.; *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.,* 875 F.3d 107, 113-14 (2d Cir. 2017). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage*, 875 F.3d at 113-14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). He cannot "rely on conclusory allegations or unsubstantiated speculation but must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 34 (2d Cir. 2015) (quotation marks and citation omitted). Although the court

is required to read a self-represented "party's papers liberally and interpret them to raise the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015), "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

## III.    DISCUSSION

After initial review under 28 U.S.C. § 1915A, the Court permitted Harvin to proceed on the following federal claims:

(1) Eighth Amendment deliberate indifference to Harvin's substantial risk of serious harm from his cellmate, Inmate 1, and/or for failing to protect Harvin from his substantial risk of being seriously harmed by Inmate 1 against Lieutenant Cheney, Correction Officer Brysgel, Counselor Supervisor Stanley, Captain Roy, SRG Coordinator Captain Papoosha, Warden Barone, and Correction Officer Nguyen in their individual capacities;

(2) Eighth Amendment excessive force against Lieutenant Cheney and Lieutenant McDonald in their individual capacities;

(3) Eighth Amendment deliberate indifference to his substantial risk of serious harm while confined within NMCD against Commissioner Quiros and Captain Papoosha in their individual and official capacities;

(4) First Amendment violation against Lieutenant Cheney, Correction Officer Brysgel, Counselor Supervisor Stanley, Captain Roy, Captain Papoosha, Warden Barone, and Correction Officer Nguyen for subjecting Harvin to being housed with and assaulted by Inmate 1 in retaliation for his prior lawsuit against Lieutenant Cheney and filing of numerous grievances;[11]

---

[11]On September 11, 2019, Harvin filed a lawsuit against fifteen DOC officials in their individual and official capacities: Officer Cheney, Officer Hermanowski, Lieutenant Legassey, Officer Baez, Officer Pagan, Officer Briatico, Officer Tarbor, Officer Patterson, Officer Smiley, Officer Melendez, Lieutenant Rivera, former Warden William Mulligan, Lieutenant Prior, former Deputy Warden Roach, and District Administrator Angel Quiros. ECF No. 1, *Harvin v. Cheney*, 3:19cv1429 (JCH). After initial review, the Court permitted Harvin to proceed on Eighth Amendment excessive force claims against Cheney, Hermanowski, Baez, Tarbor, Pagan, Briatico, Patterson, and Legassey in their individual capacities; an Eighth Amendment claim against Legassey in his individual capacity based on his placing Harvin in tight in-cell restraints and telling medical staff that Harvin had refused treatment for his injuries; and a Fourteenth Amendment due process claim against Smiley, Melendez, Prior, Rivera, and Quiros in their

(5) First Amendment violation against Warden Barone, District Administrator Guadarrama and Administrative Remedies Coordinator ("ARC") Bennett retaliatory treatment of his grievances due to his prior protected filings; and

(6) state law recklessness against Lieutenant Cheney, Lieutenant McDonald, Correction Officer Brysgel, Counselor Supervisor Stanley, Captain Roy, Captain Papoosha, Warden Barone, Officer Nguyen, and Commissioner Quiros.

IRO at 7-15.[12]

Defendants argue that Harvin failed to exhaust his administrative remedies required by the Prisoner Litigation Reform Act ("PLRA"); that he cannot prevail on the merits of his claims as a matter of law; and alternatively, that Defendants are entitled to qualified immunity from liability. Defs.' Mem., ECF No. 84-1.[13] The Court first considers whether Harvin has exhausted his administrative remedies in compliance with the PLRA.

**A.     PLRA**

The PLRA mandates that incarcerated plaintiffs exhaust all administrative remedies available to them before filing a claim under 42 U.S.C. § 1983. 42 U.S.C. § 1997e(a). The PLRA requires "proper exhaustion," meaning that plaintiffs must exhaust all available remedies "in compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). The requirement of exhaustion of administrative remedies serves "two main purposes." *Id.* at 89 (addressing exhaustion requirements under the PLRA). First, exhaustion gives an agency "an opportunity to correct its own mistakes with respect to the

---

individual and official capacities. ECF No. 7. After settlement negotiations, this case was reported settled and dismissed on June 1, 2021. ECF Nos. 62-63.

[12] Counselor Bennett served as the MWCI ARC at the time relevant to this action. Defs.' L.R. at ¶ 12.

[13] Defendants have asserted qualified immunity and failure to exhaust administrative remedies as affirmative defenses. *See* Answer, ECF No. 31.

programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Id.* (cleaned up). Second, exhaustion promotes efficiency because "[c]laims can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court." *Id.*

To properly exhaust a claim, "a prisoner must allege facts sufficient to alert corrections officials to the nature of the claim, and provide enough information about the conduct at issue to allow prison officials to take appropriate responsive measures." *Singh v. Lynch*, 460 F. App'x 45, 47 (2d Cir. 2012) (summary order) (internal quotations omitted). If a plaintiff does not provide such description or notice, correctional officials are not afforded the "opportunity to address complaints internally," which Congress has required before a plaintiff can pursue a federal case. *Porter v. Nussle*, 534 U.S. 516, 525 (2002). As the United States Supreme Court explained in *Woodford*:

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).

548 U.S. at 90 (citation and internal quotation marks omitted) (emphasis in original).

Notwithstanding the above, the exhaustion requirement may be excused when the administrative remedy is not available in practice even if it is "officially on the books." *See Ross v. Blake*, 578 U.S. 632, 642-643 (2016). An inmate is required "to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 642 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). The Supreme Court has established three circumstances where exhaustion is considered unavailable. These are: (1)

16

"when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when a procedure is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643-644. "Whether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements." *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015).

Because failure to exhaust administrative remedies is an affirmative defense, the defendant bears the burden of proving that the plaintiff did not exhaust his administrative remedies. *See Jones v. Bock*, 549 U.S. 199, 216 (2007). Once this burden is met, the plaintiff must show that he did exhaust his administrative remedies or that the administrative remedy is not available in practice. *See Smith v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013) (citing *Murray v. Palmer*, 2010 WL 1235591, at *4 (N.D.N.Y. Mar. 31, 2010)).

### 1.    Administrative Directive 9.6

The general grievance procedure for the Connecticut DOC is set forth in Administrative Directive 9.6. *See* Defs.' ex. L, Leighty Decl. at Attach. 1 (current version of Directive 9.6, which was in effect at the time Harvin filed this action).

Under the procedures in place during the timeframe relevant to Harvin's claim, an inmate was required to first attempt to resolve the matter informally. Specifically, an inmate can attempt to verbally resolve the issue with an appropriate staff member or supervisor. *See* A.D. 9.6(6)(a)(i)(1) & (2). If the attempts to resolve the matter verbally are not effective, the inmate

17

can make a written request for informal resolution by sending a specific form to the appropriate staff member. A.D. 9.6(6)(a)(i)(3). The written form is required to "clearly state the problem and the action requested to remedy the issue." A.D. 9.6(6)(a)(i)(4)(a). Correctional staff are required to respond to a written request form within fifteen business days of receipt. A.D. 9.6(6)(a)(i)(8). If an inmate does not receive a response to the written request within fifteen business days or if the inmate is not satisfied with the response to his request, the inmate can file a Level 1 Grievance. A.D. 9.6(6)(a)(ii)(1) & (2). The Level 1 Grievance is required to be filed within thirty calendar days from the date of the occurrence or discovery of the cause of the grievance, and inmates are directed to include with the grievance a copy of the response to the inmate's written request to resolve the matter informally or an explanation for why the response is not attached. A.D. 9.6(6)(a)(ii)(2)–(4). The Unit Administrator must respond in writing to the Level 1 Grievance within thirty business days of his or her receipt of the grievance. A.D. 9.6(6)(b)(i)(3). The grievance can be returned without disposition, rejected (if the administrative remedy fails to satisfy the procedural requirements of the requested remedy), denied, compromised, upheld, or withdrawn. A.D. 9.6(5)(n)(i)-(ii); A.D. 9.6(6)(b)(i)(2)(a)(1)-(2); *see also* A.D. 9.6(3)(h). If an administrative remedy is rejected, the inmate shall have five calendar days to correct the defect and resubmit the administrative remedy request. A.D. 9.6(6)(b)(i)(2)(a)(1). But if the resubmitted request for administrative remedy does not correct the defect, the administrative remedy request shall be rejected and not subject to further appeal. A.D. 9.6(6)(b)(i)(2)(a)(2).

The procedures further provide that the inmate can appeal the Unit Administrator's disposition of the Level 1 Grievance, or the Unit Administrator's failure to dispose of the grievance in a timely manner, through a Level 2 Grievance. *See* A.D. 9.6(6)(b)(ii). An inmate

seeking to appeal a Level 1 Grievance is required to file the Level 2 Grievance appeal within five calendar days of the inmate's receipt of the decision on the Level 1 Grievance. *See* A.D. 9.6(6)(b)(ii)(1). An inmate seeking to appeal the Unit Administrator's failure to dispose of the Level 1 Grievance in a timely manner is required to do so within sixty-five days of the date the Level 1 Grievance was filed by the inmate. A.D. 9.6(6)(b)(ii)(2). Level 2 Grievance appeals of inmates confined in Connecticut correctional facilities are reviewed by the appropriate District Administrator. A.D. 9.6(6)(b)(ii)(3)(a). The District Administrator must respond to the Level 2 Grievance appeal within thirty business days of receipt of the appeal. A.D. 9.6(6)(b)(ii)(4).

Level 3 Grievance appeals are restricted to challenges to department policy, challenges to the integrity of the grievance procedure, and Level 2 Grievance appeals to which there had been no timely response by the District Administrator. *See* A.D. 9.6(6)(b)(iii)(1). A Level 3 Grievance appeal is required to be filed within five calendar days from the inmate's receipt of the decision on the Level 2 Grievance appeal. *See* A.D. 9.6(6)(b)(iii)(2). A Level 3 Grievance appeal of the District Administrator's failure to dispose of the Level 2 Grievance appeal in a timely manner was required to be filed within sixty-five calendar days of the filing of the Level 2 Grievance appeal. *See* 9.6(6)(b)(iii)(2)(a). Level 3 Grievance appeals are reviewed by the Commissioner of the Department of Correction or his designee. *See* A.D. 9.6(6)(b)(iii)(3).

## 2. Exhaustion of Remedies for Harvin's Claims Arising During his MWCI Confinement

Harvin was obligated to exhaust his administrative remedies for his Eighth Amendment claims against custody staff under Administrative Directive 9.6 prior to filing this action. *See Riles v. Buchanan*, 656 F. App'x 577, 579 (2d Cir. 2016) (affirming district court's dismissal

based on inmate's failure to exhaust, under Administrative Directive 9.6, his excessive force claim against correctional staff).

Harvin admits he was familiar with Directive 9.6, had a physical copy of it, and had previously received instruction on the grievance procedure from both staff and other inmates. Defs.' L.R. at ¶ 60; Defs.' ex. Q, Harvin Dep. at 7-8. Defendants have submitted the declaration of Counselor Supervisor Leighty, who had access to the DOC historic archive of inmate grievances, including the DOC database of grievances filed under Directive 9.6 at DOC facilities. Defs.' ex. L, Leighty Decl. at ¶ 5. Leighty's declaration attaches copies of records relevant to Harvin's grievance filings. *Id.* at Attach. 2. After review of the DOC electronic records for grievances filed by Harvin while housed at MWCI, Leighty determined that Harvin filed the following four Level 1 grievances and one Level 2 Grievance appeal under Directive 9.6 relevant to this action. Defs.' L.R. at ¶ 66.

Harvin filed a Level 1 Grievance (IGP #137-22-097) that was received on September 21, 2021. Defs.' ex. L, Leighty Decl. at 22-23 (Attach. 2). In it, Harvin complained that correctional staff ignored his cries for help while being assaulted on September 3, 2021, and that Lieutenant Cheney sprayed chemical agent in his face when he was not fighting. *Id.* On September 30, 2021, Warden Barone rejected this Level 1 Grievance for the stated reason that Harvin had not satisfied the informal resolution requirements of Directive 9.6(6)(a). Defs.' L.R. at ¶ 67; Defs.' ex. L, Leighty Decl. at 21-22 (Attach. 2). She advised that under Directive 9.6(6)(b), Harvin had five calendar days to correct the defect and "resubmit a request for administrative remedy," but that a resubmitted remedy that did not correct the defect would be rejected and would be unappealable. *Id.* at 21.

20

Harvin filed a second Level 1 Grievance (IGP# 137-22-106) that was received on

September 27, 2021. *Id.* at 31-32. In this grievance, Harvin complained that he was placed with a

violent high security cellmate (Inmate 1) on August 3, 2021, and that correctional officers acted

without concern for inmate safety when they failed to follow DOC directives and procedures

relevant to inmates on high security status, such as regular cell searches, while he was housed

with Inmate 1 for "thirty days or so." *Id.* On September 30, 2021, Warden Barone rejected this

Level 1 Grievance for the stated reason that Harvin had not satisfied the informal resolution

requirements of Directive 9.6(6)(a). Defs.' L.R. at ¶ 68; Defs.' ex. L, Leighty Decl. at 30-31

(Attach. 2).[14] She again advised Harvin of his ability to resubmit a corrected remedy within five

calendar days under Directive 9.6(6)(b)(2)(i)(1). *Id.* at 30 (Attach. 2).

Harvin's third Level 1 Grievance (IGP# 137-22-114) was received on October 4, 2021.

*Id.* at 34. In this Level 1 Grievance, Harvin addressed the deficiency of his rejected IGP# 137-

22-106 by explaining that he attempted to resolve his complaint informally on September 4,

2021, but had not received a timely response to his written request. *Id.* at 34. In his grievance,

Harvin again complained that he was placed with a violent high security cellmate (Inmate 1) on

August 3, 2021, and that correctional officers acted without concern for inmate safety when they

failed to follow DOC directives and procedures relevant to inmates on high security status, such

as regular cell searches, while he was housed with Inmate 1 for "thirty days or so." *Id.* at 34-35.

In a disposition dated October 14, 2021, Warden Barone rejected this Level 1 Grievance, stating

---

[14] Defendants represent that Warden Barone rejected Harvin's IGP# 137-22-106 on September 30, 2021
as an undisputed fact. Defs.' L.R. at ¶ 68. But Grievance IGP# 137-22-106 shows the date of October 30,
2021 in the "Date of Disposition" box, and at the same time, it shows September 30, 2021 as the date
Warden Barone signed the grievance. Defs.' ex. L, Leighty Decl. at 31 (Attach. 2). For purposes of ruling
on this motion, the Court assumes the rejection date to be September 30, 2021.

that it was received on October 4, 2021, but was "discussing an incident that occurred on 8/3/2021" and not filed "within 30 calendar days of the occurrence or discovery of the cause of the Grievance[.]" *Id.* at 34. Warden Barone checked the box to indicate that her rejection of the grievance was not subject to further appeal. *Id.*

Harvin's fourth Level 1 Grievance (IGP# 137-22-115) was received on October 4, 2021. *Id.* at 40. It addressed the deficiency of his prior rejected Grievance—IGP# 137-22-097— by explaining that he attempted to resolve his complaint informally on September 4, 2021, but had not received a timely response to his written request. *Id*. Harvin complained that correctional staff ignored his cries for assistance while he was being assaulted on September 3, 2021, and that Lieutenant Cheney sprayed his face with a chemical agent when he was not fighting. *Id.* at 40-41. On November 16, 2021, Warden Barone denied this Level 1 Grievance for the stated reason that there was "no evidence to substantiate [his] claims of any staff misconduct and/or violation of Administrative Directive 2.17, Employee Conduct." *Id.* at 40.

In his Level 2 Grievance appeal, Harvin complained that correctional officers ignored his cries for help during his assault and requested that his Level 1 Grievance be "reconsidered and reevaluated." *Id.* at 37. District Administrator Guadarrama upheld Warden Barone's decision and denied Harvin's Level 2 Grievance appeal. *Id.*

Defendants maintain that Harvin has only exhausted his claims of (1) Eighth Amendment deliberate indifference to his health and safety due to correctional staff ignoring his calls for aid during his assault by Inmate 1, and (2) excessive force arising on September 3, 2021. Defs.' Mem. at 14. Defendants argue that Harvin has not exhausted his First Amendment claims of

22

retaliation or Eighth Amendment claims of deliberate indifference to his risk of harm posed by housing him with Inmate 1. *Id.* at 11-14.

### a.    First Amendment Retaliation

Harvin is proceeding on two claims of First Amendment retaliation. He asserts: (1) Lieutenant Cheney, Officer Brysgel, Counselor Stanley, Captain Roy, Captain Papoosha, Officer Nguyen and Warden Barone subjected him to being housed with and assaulted by Inmate 1 in retaliation for his filing a lawsuit against correctional staff, including Cheney, and his filing of numerous grievances; and (2) Warden Barone, District Administrator Guadarrama and ARC Bennett acted with a retaliatory animus in their treatment of his grievances due to his prior protected conduct. *Id.* at 10-11.

The Second Circuit has ruled that under the PLRA a grievance must identify a prison official's retaliatory action–and the reason for it—before the inmate may sue for First Amendment retaliation. *See Munger v. Cahill*, 792 F. App'x 110, 112 (2d Cir. 2020) ("But Munger did not specify that his medication was taken away because of a lie a nurse told in retaliation against him for an earlier complaint ... [b]ecause Munger's grievances did not mention retaliation, Appellees were not on notice of Munger's complaint of retaliation by Nurse White."); *Gomez v. Dep't of Correction,* 2022 WL 788261, at *5 (D. Conn. Mar. 15, 2022) (explaining that a grievance that fails to identify a prison official's retaliatory reason for an adverse action is not adequate to satisfy the PLRA's exhaustion requirement and thereby support a claim for First Amendment retaliation).[15] An inmate need not "specifically articulate his claims in grievances in

---

[15] *See, e.g.*, *Baltas v. Rivera*, 2020 WL 6199821 at *10 (D. Conn. 2020) (noting plaintiff's prior grievances had not "alerted prison officials that the plaintiff was complaining that [defendants] had taken some action against him ... because he had previously filed a grievance or engaged in other First Amendment-protected activity ... [a]ccordingly, the plaintiff has failed to exhaust his First Amendment

the exact same manner that he articulates them in federal court," but he must give prison officials notice "about the factual basis of his claims." *Edwards v. Melendez*, 832 F. App'x 50, 54 (2d Cir. 2020) (summary order) (affirming district court's holding that inmate failed to exhaust retaliation and equal protection claims, where none of inmate's grievances asserted that the defendant "acted in a retaliatory manner or that DOC was applying the Directive in a discriminatory manner").

Thus, the fact that Harvin filed grievances complaining that DOC staff failed to protect him from Inmate 1 or used excessive force during the assault on September 3, 2021 was not sufficient to alert DOC officials that he sought a remedy for retaliatory adverse action—housing him in the same cell as Inmate 1 and subjecting him to harm from assault by Inmate 1—because of his prior grievance filings and his lawsuit against correctional staff, including Lieutenant Cheney.

In his Level 2 Grievance IGP# 137-22-115 seeking reconsideration of Warden Barone's denial of his grievance about the response to the assault, Harvin requested—as one of several grievance resolutions—to be placed in the general population "without retaliation pertaining to any of my previous behavior prior to Dec-1-2021." Defs.' ex. L, Leighty Decl. at 37-38 (Attach. 2). But Harvin's vague reference to retaliation for "previous behavior prior to December 1, 2021" provides no factual basis to alert prison officials he sought a remedy for a retaliatory cell placement with Inmate 1 and the failure to protect him from Inmate 1's assault because of his prior lawsuit and grievance filings.[16]

---

retaliation claim"); *accord Shifflett v. Korszniak*, 934 F.3d 356, 366 (3d Cir. 2019) ("Retaliation is a separate claim, and therefore must be separately grieved.").

[16] Moreover, any claim for redress for retaliation was not reviewed on the merits of his Level 1 Grievance.

None of Harvin's grievances alerted DOC officials that he claimed that correctional officials subjected him to retaliatory adverse action by placing him with and failing to protect him from Inmate 1 because he had previously engaged in conduct protected under the First Amendment. Nor did his grievances provide information for DOC officials to address his claim that he suffered adverse treatment in retaliation for his First Amendment-protected conduct. So, the Court cannot conclude that Harvin used all of the steps under the administrative directive to exhaust his two claims of First Amendment retaliation. *See Urbanski v. Dep't of Correction*, 2019 WL 6683047, at *6 (D. Conn. Dec. 5, 2019) (quotation omitted) (noting that "[t]o properly exhaust a § 1983 claim in Connecticut, a prisoner must comply with *all* steps set forth in Directive 9.6, including deadlines and utilization of each step of the administrative appeal process." (emphasis original)).

No evidence in the record suggests that Harvin's administrative remedies to grieve his First Amendment retaliation claims were unavailable to him under *Ross*, 578 U.S. at 643-44. Harvin has admitted that he was well aware of the grievance procedure under Directive 9.6, Defs.' ex. Q, Pl.'s Dep. at 7-8, ECF No. 84-19, and did, in fact, successfully use it for his claims of excessive force and deliberate indifference to his cries for help on September 3, 2021. *See* Defs.' ex. L, Leighty Decl. at 37-41 (IGP #137-22-115) (Attach 2).

Because Defendants have met their burden of demonstrating no genuine issue of material fact relevant to Harvin's non-exhaustion of his remedies under Administrative Directive 9.6, and because there is no evidence that administrative remedies were unavailable, the Court must grant the motion for summary judgment on Harvin's claims of First Amendment retaliation.

    **b.**    **Eighth Amendment Deliberate Indifference to Harvin's Substantial Risk of Serious Harm from His Being Housed with Inmate 1**

Harvin asserts claims of Eighth Amendment deliberate indifference to his safety. Harvin's allegations suggest (1) that Roy, Cheney, Brysgel, and Stanley acted with deliberate indifference to his health and safety when they referred to his inmate requests as "snitch requests," called him a snitch, or informed Inmate 1 about his requests to have him moved; and (2) that Barone, Papoosha, Roy, Stanley, Cheney, and Brysgel ignored his substantial risk of serious harm from housing him in a cell with Inmate 1. Compl. at ¶¶ 4-15, 18, 20, 22, 25.

To exhaust his remedies for a claim under the PLRA, Harvin's grievance had to "provide enough information about the conduct of which [he] complain[ed] to allow prison officials to take appropriate responsive measures." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004) (grievance must contain sufficient information to alert prison officials about "the nature of the wrong for which redress is sought.").

### i.    Correctional Staff Comments and Information to Inmate 1

There is no evidence that Harvin filed any grievances to alert prison officials that correctional staff communications about his requests concerning Inmate 1 or his being a snitch exposed him to substantial risk of serious harm. The record shows that Harvin was aware of the administrative remedy process but failed to take the steps necessary to exhaust such complaints under Directive 9.6 in compliance with the PLRA. As the record raises no issue of fact concerning the unavailability of Harvin's remedies, the Court must grant the motion for summary judgment as to Harvin's claims arising from any correctional staff communications concerning his inmate requests that exposed him to a substantial risk of serious harm in violation of the Eighth Amendment.

### ii.    Housing with Inmate 1

26

Defendants maintain that Harvin's grievances included no assertion that he requested not to be housed with Inmate 1 or that he had expressed his safety concerns to staff about being housed in a cell with Inmate 1. Defs.' Mem. at 12. But Harvin's Grievance IGP# 137-22-114 (received on October 4, 2021) sufficiently alerted prison officials of his claims concerning their indifference to his health and safety from housing him in a cell with Inmate 1. *See* Defs.' ex. L, Leighty Decl. at 34-35. *See Johnson*, 380 F.3d at 697 ("the grievant need not lay out the facts, articulate legal theories, or demand particular relief" but the grievance "suffices if it alerts the prison to the nature of the wrong for which redress is sought."). And the following evidence suggests that Harvin's administrative procedure was unavailable to exhaust this claim.

In his Level 1 Grievance IGP# 137-22-106, Harvin complained about correctional officials' failure to take adequate safety measures while he was housed for "thirty days or so" with Inmate 1 after his cell placement on August 3, 2021. Defs.' ex. L, Leighty Decl. at 31-32. Under Directive 9.6(6)(a)(ii)(4), Harvin was required to file his grievance within thirty calendar days from the date of the occurrence or discovery of the cause of the grievance. Harvin asserted he was subject to inadequate safety measures while housed with Inmate 1 from August 3 to at least September 2, 2021 (thirty days); thus, he had until at least October 2, 2021 to file a timely grievance in compliance with Directive 9.6(6)(a)(ii)(4), and therefore, his grievance marked as received on September 27, 2021, may be considered timely filed. *See id.*

On September 30, 2021, Warden Barone rejected Grievance IGP# 137-22-106 on the procedural grounds of Harvin's failure to show he attempted informal resolution. *Id.* at 30-31. In her rejection notice, Warden Barone advised Harvin of the steps under Directive 9.6(6)(b) to resubmit a grievance rejected as procedurally non-compliant. *See id.* at 30. She explained that "if

the failure to meet the procedural requirement(s) can be corrected the inmate shall have (5) calendar days to correct the defect(s) and resubmit a request for administrative remedy." *Id.*

Harvin resubmitted his request for administrative remedy in IGP# 137-22-114, which was marked as received on October 4, 2021 (four days after Warden Barone rejected IGP# 137-22-106 on September 30, 2021). *Id.* at 34-35. In it, Harvin addressed the procedural deficiency of his rejected IGP# 137-22-106 by including a statement concerning his informal resolution and again complained about prison officials' lack of safety measures while he was housed with Inmate 1 from August 3, 2021 for "thirty days or so." *Id.* Warden Barone rejected his corrected remedy as untimely for the stated reason that his grievance was "received on 10/4/2021" and "discuss[ed] an incident that occurred on 8/3/2021." *Id.* at 34. She marked the box to indicate he had no leave to appeal this disposition. *Id.*

Construed most favorably to Harvin as the non-moving party, this evidence suggests that Harvin followed the steps set forth by Warden Barone's rejection letter for Grievance IGP# 137-22-106 and under Directive 9.6(6)(b), but his remedies for this claim operated as "a simple dead end." *See Ross,* 578 at 643 (noting example where "a prison handbook directs inmates to submit their grievances to a particular administrative office—but in practice that office disclaims the capacity to consider those petitions."). Accordingly, the motion for summary judgment must be denied on Defendants' grounds of nonexhaustion for Harvin's claims of Eighth Amendment deliberate indifference to his substantial risk of serious harm from being housed in the same cell with Inmate 1.

### B.    Merits and Qualified Immunity

The Court turns next to review the arguments relevant to the merits of Harvin's remaining Eighth Amendment claims and Defendants' entitlement to qualified immunity.

### 1.      Eighth Amendment Deliberate Indifference

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994)). Prison officials have a duty under the Eighth Amendment "to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (internal quotation marks and citations omitted); *Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020) (quoting *Farmer*, 511 U.S. at 833). However, not "every injury suffered by one prisoner at the hands of another ... translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834.

For an inmate's claim of deliberate indifference to health or safety, an inmate is required to satisfy an objective and a subjective element. To meet the objective element, the inmate must demonstrate that he was incarcerated under a condition or a combination of conditions that resulted in a "sufficiently serious" deprivation of a life necessity or a "human need[ ]" or posed "a substantial risk of serious harm" to his health or safety. *Farmer*, 511 U.S. at 834; *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

To meet the subjective element, an inmate must show that the defendants possessed culpable intent; that is, the defendants knew that he faced a substantial risk to his health or safety and disregarded that risk by failing to take corrective action. *See Farmer*, 511 U.S. at 834, 837. The defendants "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id.* at 837. "[M]ere

negligen[t]" conduct is insufficient. *Id.* at 835. Rather, a plaintiff must provide evidence to support a claim that a defendant knew of and disregarded a serious risk of harm to his health and wellbeing. *See Tangreti v. Bachman*, 983 F.3d 609, 619 (2d Cir. 2020)

### 2.    Qualified Immunity

"The doctrine of qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Soto v. Gaudett*, 862 F.3d 148, 156 (2d Cir. 2017) (internal quotation marks and brackets omitted). A right is clearly established if, "at the time of the challenged conduct ... every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). There is no requirement that a case have been decided which is directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Radwan v. Manuel*, 55 F.4th 101, 114 (2d Cir. 2022) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Torcivia v. Suffolk Cty., New York*, 2021 WL 5183543, at *17 (2d Cir. Nov. 9, 2021) (quoting *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004)).

Even when a right is clearly established, qualified immunity protects government officials when it was objectively reasonable for them to believe that their conduct in the particular factual context at issue did not violate that clearly established right. *See Manganiello v. City of New York,* 612 F.3d 149, 165 (2d Cir. 2010). "If a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability." *Ziglar v. Abbasi*, 137 S. Ct.

1843, 1867 (2017). "The objective reasonableness of an official's conduct is a mixed question of law and fact." *Nazario v. Thibeault*, 2022 WL 2358504, at *8 (D. Conn. June 30, 2022) (quoting *Taravella v. Town of Wolcott,* 599 F.3d 129, 133 (2d Cir. 2010)) (internal quotation marks and alterations omitted).

Thus, "[a]lthough qualified immunity is a question of law, because [the] issue of reasonableness depends on the facts of the situation, if there is a dispute as to the facts, that must be resolved by the factfinder before qualified immunity can be granted." *Maye v. Vargas*, 638 F. Supp. 2d 256, 262 (D. Conn. 2009).

### a.    Harvin's Housing with Inmate 1

Defendants argue that that Harvin cannot show that any Defendant acted with the deliberate indifference to his substantial risk of serious harm while housed in the same cell as Inmate 1. Defs.' Mem at 18-21.

In his opposition memorandum, Harvin admits that that he referred to Inmate 1 as "bro" in a telephone call, and that he and Inmate 1 "at some point were OK" or "cool & friends prior to Sept-3-21." Pl.'s Opp. at 47, 49. *See* Defs.' ex. P, 8/4/2021 Telephone Call at 6:23-6:34 (referring to his "celly and "bro"); *id.* at 14:05-14:50 (Harvin can be heard laughing with the other male party on call and with Inmate 1). Harvin explains that well before the assault on September 3, 2021, Inmate 1 "began (attempting) to (secretly) and with sneaky intentions make trouble for [him] with other (gangs and member or SRG)." Pl.'s Opp. at 47; s*ee also* Defs.' ex. P, Telephone Call 9/11/2021 at 9:17-10:23 (explaining tension due to power conflict between he and Inmate 1).

### i.    Warden Barone

As he is seeking monetary damages from Warden Barone in her individual capacity, Harvin must establish her personal involvement in the alleged constitutional violation. *See Tangreti*, 983 F.3d at 620 (a plaintiff must "plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability"); *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.").

Warden Barone avers that she does not specifically recall Harvin, that she delegated the authority regarding housing decisions to Captain Roy, and that she did not receive a communication from Harvin relevant to his safety concerns about Inmate 1. Defs.' ex. B, Barone Decl. at ¶¶ 4-6. Harvin claims that Warden Barone (among others) never responded to his written requests complaining about his safety risk from Inmate 1. Compl. at ¶¶ 7, 22-23; Pl.'s Opp. at 48. But Harvin's assertion that he sent written complaints to Warden Barone, without more, is insufficient to establish the official's personal involvement in a § 1983 constitutional claim. *See Adams v. Annucci*, 2023 WL 2664301, at *11 (S.D.N.Y. Mar. 28, 2023) (stating receipt of an inmate's letter, by itself, is not personal involvement); *Smart v. Annucci*, 2021 WL 260105, at *5 (S.D.N.Y. Jan. 26, 2021) ("That [Defendants] failed to act on plaintiff's complaints ... cannot support the inference that these Defendants, through '[their] own individual actions, [have] violated the Constitution.'").

No evidence suggests that Warden Barone was aware that Harvin was housed in the same cell as Inmate 1 or that she was familiar with Harvin's relationship with Inmate 1 before or after August 3, 2021. Thus, no reasonable jury reviewing the record could determine that Warden

Barone acted with deliberate indifference to Harvin's safety risk from being housed with Inmate 1 in violation of the Eighth Amendment. Accordingly, the Court must grant Defendants' motion for summary judgment on this Eighth Amendment claim against Warden Barone.

### ii.    Captain Papoosha

Captain Papoosha is the SRG Coordinator and the Security Director's designee for handling all matters pertaining to the DOC SRG program, including gathering and disseminating gang intelligence. Defs.' L.R. at ¶ 7. Captain Papoosha declares that he had no authority over, or role in, housing decisions at MWCI's SRG Unit. Defs.' ex. F, Papoosha Decl. at ¶ 13. He avers that he advised Captain Roy that he had "no reason to believe there was any health or safety concern with Inmate 1 and [Harvin] being celled together" and that his only concern was that two high ranking SRG members of the same affiliation celled together could work to cause a disturbance. *See* Defs.' ex. D, Roy Decl. at ¶ 14; Defs.' ex. F, Papoosha Decl. at ¶¶ 12-13. He explains that DOC intelligence at the time indicated Inmate 1 and Harvin had upper level leadership—as number 1 and number 2, respectively—within their SRG subset, and that he believed they seemed at the time to be on friendly terms with each other. *Id.* at ¶¶ 8, 12.

Harvin argues that, before Captain Roy's housing decision, information in disciplinary and prison records available to SRG intelligence indicated conflict between the two inmates. Pl.'s Opp. 47, 49, 53, 55. In support of this assertion, he submits an SRG affiliation disciplinary report (issued from the DOC Intelligence Office) concerning a telephone call on January 31, 2021 with a third party named "Polo." *Id.* at 102. The disciplinary report states:

> Harvin makes several inquiries within the conversation on "Polo's" status within the gang. At cursor mark 5:46, Harvin asks, "who you getting money with, though?" A term used to identify which ranking member an individual was affiliated with. Polo responded with, [**known alias of Inmate 1**]**.** Harvin discredits [Inmate 1's] rank and disseminates

information on the status of the **"Mac Baller Family,"** while also stating in cursor mark 7:40, **"I got the situation for CT, you heard? I got the don for Self Made, CT,"** establishing his leadership role within the subset.

*Id.*

This summary of Harvin's discussion reflects only that Harvin represented to a third party that he held a higher rank than Inmate 1 within his SRG subset. It does not suggest that Inmate 1 was aware of the conversation, and Harvin points to evidence that "Polo" ever shared the conversation with Inmate 1. As a result, the reported conversation is not enough to suggest that Captain Papoosha knew that Inmate 1 posed a substantial risk of serious harm to Harvin.

On the present evidentiary record, no reasonable jury could find that Captain Papoosha acted with deliberate indifference to Harvin's safety in violation of the Eighth Amendment. Alternatively, Captain Papoosha is entitled to qualified immunity because it was objectively reasonable for him to believe that his conduct at the time did not constitute deliberate indifference in violation of the Eighth Amendment. The Court grants the motion for summary judgment in Captain Papoosha's favor on this claim.

### iii.    Lieutenant Cheney, Officer Brysgel, Captain Roy, and Counselor Supervisor Stanley

In his verified allegations, Harvin alleges that Lieutenant Cheney and Officer Brysgel indicated that they knew Inmate 1 posed a risk of harm to his safety; and that he spoke to Captain Roy and Counselor Supervisor Stanley about his safety concerns related to his being housed with Inmate 1. Compl. at ¶¶ 5, 15, 18-20. A jury considering Harvin's testimony about his communications with Cheney, Brysgel, Roy, and Stanley could determine that these Defendants ignored information indicating that housing Harvin and Inmate 1 in the same cell posed a substantial risk of serious harm to Harvin's health and safety.

Accordingly, disputed material facts preclude granting summary judgment on the merits of Harvin's Eighth Amendment claims against Lieutenant Cheney, Officer Brysgel, Captain Roy, and Counselor Supervisor Stanley for deliberate indifference to Harvin's serious risk of substantial harm from being housed in the same cell as Inmate 1. The qualified immunity analysis turns on factual questions about Defendants' awareness of Harvin's safety risks from being housed with Inmate 1, and so the Court cannot assess, as a matter of law, whether it was objectively reasonable for these Defendants to believe their failure to take any steps to alleviate Harvin's risk of harm did not violate the Eighth Amendment. The Court denies Defendants' motion for summary judgment on the Eighth Amendment deliberate indifference claims against Lieutenant Cheney, Officer Brysgel, Captain Roy, and Counselor Supervisor Stanley.

### b.    Correctional Staff Response on September 3, 2021

Harvin asserts that his calls for help were ignored after Inmate 1 threatened him and assaulted him on September 3, 2021. *See* Compl. at ¶¶ 25-40.

### i.    Counselor Supervisor Stanley, Captain Roy, Captain Papoosha, and Warden Barone

Defendants Stanley, Roy, Papoosha, and Barone aver that they were not present at MWCI or in the SRG Unit at the time leading up to the assault or during the assault. *See* Defs.' ex. B, Barone Decl. at ¶ 7 (not at the facility); Defs.' ex. D, Roy Decl. at ¶ 20 (not on duty or at the facility); Defs.' ex. E, Stanley Decl. at ¶ 11( not at the facility); Defs.' ex. F, Papoosha Decl. at ¶ 4 (not at the facility).

No evidence suggests that these Defendants had any involvement in the correctional staff response to the assault on September 3, 2021. Accordingly, no reasonable juror could review this record and determine that Stanley, Roy, Papoosha, or Barone violated Harvin's Eighth

Amendment rights by acting with deliberate indifference to his substantial risk of serious harm on September 3, 2021. The Court grants the motion for summary judgment in favor of these Defendants on such Eighth Amendment claims.

### ii.    Correction Officer Nguyen

In his verified complaint, Harvin alleges that he was ignored after he walked out of his cell and then pushed the panic button at 8:50 and 8:53 PM, just prior to being attacked by Inmate 1. Compl. at ¶¶ 25-30. He asserts that he continued to scream for assistance during the assault to no avail. *Id.* at ¶¶ 30-33. He claims that Correction Officer Nguyen opened the cell door; laughed and made mocking comments when he noticed the assault; closed the door but then reopened the cell door seconds later and ignored Harvin's request for him to call a Code; and then closed the door for a second time. *Id.* at ¶¶ 35-36. He states that seconds later, Correction Officer Mann noted the assault by looking through the cell window and called the Code. *Id.* at ¶¶ 39-40.

Defendants assert that the video of the incident does not show that Correction Officer Nguyen acted with deliberate indifference to Harvin's substantial risk of serious harm from the assault by Inmate 1. Defs.' Mem. at 21-22. Where the parties present conflicting versions of an incident and video evidence of the incident has been submitted on a motion for summary judgment, the court must view the facts "in the light depicted" by the video of the incident. *See Scott v. Harris,* 550 U.S. 372, 380–81 (2007).

Upon review, the Court concludes that the surveillance video substantiates that Harvin did not come out of his cell at any time during a period of twenty minutes before the Code was called. *See* Defs.' ex. N at 39:37-59.37. The surveillance video shows that Officer Nguyen

escorted an inmate to the cell next to Harvin's cell 67, noticed the door to cell 67 opening twice, and acted to close the door but did not enter the cell. *See id.* at 55.22-56:40.

Officer Nguyen declares that he could not see inside of the cell due to the light being off, and that he did not hear any sound or Harvin yelling for assistance while he stood next to cell 67. *See* Defs.' ex. J, Nguyen Decl. at ¶ 12. It is not possible to discern from the video surveillance footage whether Officer Nguyen could have seen anything through cell window before walking away from cell 67. *See* Defs.' ex. N at 55:42 to 56:40. Because surveillance video does not contain any sound or provide a clear depiction of Harvin's cell, it does not establish as an undisputed fact that Officer Nguyen could not hear Harvin's cries for help and was unaware of the assault when he left the area. The surveillance video shows that shortly after Nguyen walked away from cell 67, Officer Mann looked through the cell window and immediately called the Code. Defs.' ex. N at 59.30-59:37. In addition, Lieutenant Cheney and Officers Brysgel and Mann all declare that they were able to discern blood and inmates fighting in the cell. *See* Defs.' ex. G, Cheney Decl. at ¶ 14; Defs.' ex. I, Brysgel Decl. at ¶¶ 11-12; Defs' ex. K, Mann Decl. at ¶ 7. Harvin has also submitted two declarations from inmates who aver that they were present in Harvin's unit during the assault on September 3, 2021, and that they could hear his cries for help. *See* Pl.'s Opp. at 91-98 (Gonzalez and Vaughn Decls.).

The record raises genuine issues of fact that must be resolved by a jury. Likewise, the disputed questions of fact preclude a qualified immunity determination that Officer Nguyen could reasonably believe that he did not act with deliberate indifference to Harvin's health and safety. Thus, the Court must deny motion for summary judgment on this Eighth Amendment deliberate indifference claim against Officer Nguyen.

### iii.    Officer Brysgel

Officer Brysgel declares that he was not present in Harvin's SRG housing unit prior to responding to the Code called by Officer Mann. *See* Defs.' ex. I, Brysgel Decl. at ¶¶ 10-11. Officer Brysgel avers that he noted the inmates fighting in the cell and blood indicating the presence of a weapon; and that the inmates ignored his verbal command to cease fighting and to be handcuffed. Defs.' ex. I, Brysgel Decl. at ¶¶ 11-14. Officer Brysgel explains that he assisted with Harvin's handcuffing and his initial escort but was relieved due to his exposure to blood during the handcuffing process. *Id.* at ¶¶ 15-16.

Officer Brysgel had a duty under the Eighth Amendment to use reasonable measures to protect Harvin from suffering from violence by terminating the physical assault, but "corrections officers are not the personal body guards of inmates" and must have a "reasonable opportunity" to intervene to prevent the harm. *See Ryan v. Bell*, 2024 WL 36591, at *5 (N.D.N.Y. Jan. 3, 2024) (citing *Hayes*, 84 F.3d at 620 and *Farmer*, 511 U.S. at 832-33).

Here, the record supports no inference that Officer Brysgel had a reasonable opportunity to enter the cell and intervene in the assault before the termination of the inmate's physical altercation following the issuance of the chemical agent. No reasonable jury could determine after review of the present record that Officer Brysgel acted with Eighth Amendment deliberate indifference to Harvin's risk of harm after he responded to the Code. Alternatively, the Court concludes that the record demonstrates Officer Brysgel is entitled to qualified immunity because he could reasonably believe that his conduct did not violate Eighth Amendment standards. Accordingly, the Court grants Defendants' motion for summary judgment on Harvin's claim

against Officer Brysgel for Eighth Amendment deliberate indifference after he responded to the Code.

### iv.    Lieutenant Cheney

Harvin asserts that Lieutenant Cheney violated the Eighth Amendment after he responded to the Code. *See* Compl. at ¶ 41. Lieutenant Cheney explains that he determined it would not be safe to enter the cell as the large amount of blood indicated the presence of a weapon; and after the inmates failed to heed his order, he assessed that the safest way to end the altercation was to disperse one burst of chemical agent in the area of both Harvin and Inmate 1. *See* Defs.' ex. G, Cheney Decl. at ¶¶ 15-16. There is no dispute that that the inmates stopped fighting after he sprayed the chemical agent and complied with his instruction to come to the door to be handcuffed. *See id.* at ¶ 17; *see* Defs.' ex. Q, Pl.'s Dep. at 5; Compl. at ¶¶ 43, 45.

To the extent Harvin asserts Lieutenant Cheney should have entered the cell to protect him from Inmate 1's assault, *see* Compl. at ¶ 43, the record supports no inference that Lieutenant Cheney had a reasonable opportunity to enter the cell and intervene in the assault prior to spraying the burst of chemical agent. Generally, a correctional staff's use of a chemical agent on a "recalcitrant inmate" to force compliance with a direct order is considered a good faith effort to restore order. *Vazquez v. Spear*, 2014 WL 3887880, at *5 (S.D.N.Y. Aug. 5, 2014). No reasonable jury reviewing this evidence could conclude that Lieutenant Cheney acted with deliberate indifference to Harvin's safety when he issued verbal commands and applied a single burst of chemical agent from outside of the cell to terminate the physical assault.[17]

---

[17] In his complaint, Harvin asserts that Lieutenant Cheney later entered the cell and sprayed him in the face with another burst of chemical agent even though he was lying on the floor, covered with blood, and not fighting. Compl. at ¶ 44. But in his deposition, Harvin denied that Officer Cheney had sprayed the chemical agent more than once. Defs.' ex. Q, Pl.'s Dep. at 6.

Nor does the record support a claim that Lieutenant Cheney acted with deliberate indifference to any serious harm caused from the chemical agent exposure. In his deposition, Harvin explains that the chemical agent hit the side of his face while he was in the "knee position on the floor." Defs.' ex. Q, Pl.'s Dep. at 5. The escort video shows that Harvin initially showed discomfort with his eyes and expressed pain and difficulty breathing due to his chemical agent exposure. Defs.' ex. O, Escort Footage at 00:16-9:05. But Harvin was immediately brought to a medical room where he had his eyes flushed and did not exhibit any serious difficulty breathing; *id.* at 9:05-11:30. And after having his eyes flushed, he could fully open his eyes. *See id.* at 12:20-22:02.[18]

District courts within this Circuit have generally declined to find "[t]he residual effects of a chemical agent" alone as sufficiently serious to satisfy the objective element of the Eighth Amendment. *See Jones v. Wagner,* 2022 WL 1525134, at *10 (D. Conn. May 13, 2022) ("The residual effects of a chemical agent generally do not, without more, constitute a serious medical need.").

Here, the evidentiary record shows that Harvin experienced at most temporary discomfort from the chemical agent exposure prior to having his eyes flushed. No evidence supports an inference that Harvin suffered any objectively serious injury or pain as a result of his exposure to the chemical agent. Nor is there any evidence that Lieutenant Cheney was aware that his use of the chemical agent would expose Harvin to any serious risk of harm. Accordingly, no reasonable

---

[18]  He was smiling a little more than ten minutes after his eyes were flushed. *Id.* at 22:46; *see also id.* at 38:05 (smiling and laughing with DOC staff members); *see also id.* at 39:40-42 (smiling during discussion with nurse).

jury reviewing the present record could conclude that Lieutenant Cheney exposed Harvin to the chemical agent with deliberate indifference in violation of the Eighth Amendment.

Alternatively, based on the present record, the Court concludes that Lieutenant Cheney is entitled to qualified immunity because he could have reasonably believed that he was not acting with any deliberate indifference to Harvin's health and safety in violation of the Eighth Amendment under the circumstances.

The Court grants the motion for summary judgment in Lieutenant Cheney's favor on this claim.

### c.    Deliberate Indifference to Harvin's Risk of Harm while Confined in NMCD

The Court permitted Harvin to proceed on a claim of deliberate indifference to his substantial risk of serious harm while confined in NMCD against both Commissioner Quiros and Captain Papoosha in their individual and official capacities. *See* IRO at 9, 15.

Here, the undisputed record reflects that neither Commissioner Quiros nor Captain Papoosha were involved in issues concerning inmates transferred to another State's custody under the interstate compact agreement. *See* Defs.' L.R. ¶¶ 75-76. Neither Defendant recalls receiving a letter from Harvin to express his safety concerns about his NMCD confinement. *See* Defs.' L.R. ¶¶ 75-76. Nor is it disputed that Defendants would have forwarded any letter from Harvin to the ICO that oversees inmates confined in other States under the interstate compact agreement. *See id.* at ¶ 97. And, in fact, Harvin has submitted letters from ICO staff in response to his correspondence expressing his concerns about his safety and request to be transferred back to Connecticut DOC. Pl.'s Opp. at 118, 120.

Even if Commissioner Quiros or Captain Papoosha directed Harvin's correspondence to ICO for a response, that is not enough to establish their personal involvement for a constitutional

claim under 42 U.S.C. § 1983. *See Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (finding no

personal involvement where DOCCS Commissioner referred inmate's letters to subordinates);

*McCrary v. Marks*, 836 F. App'x 73, 74 (2d Cir. 2021) (affirming summary judgment in favor of

supervisor in First Amendment claim because "the most he has alleged is that [the supervisor]

received his letter and directed someone at the TVPA to respond to it. This is clearly not enough

to state claim against [the supervisor].").

Harvin has not adduced evidence to suggest that either Captain Papoosha or

Commissioner Quiros was aware of but nonetheless ignored his substantial risk of serious harm

from being confined within NMCD. Accordingly, no reasonable jury reviewing the record could

determine that Commissioner Quiros or Captain Papoosha acted with deliberate indifference to

Harvin's substantial risk of serious harm while confined within NMCD.

As for his claims for official capacity relief, Harvin may only proceed for injunctive or

declaratory relief against a defendant in his or her official capacity to the extent he alleges an

ongoing constitutional violation. *See Va. Office for Prot. & Advoc. v. Stewart*, 563 U.S. 247,

254–55 (2011) (citing *Ex parte Young*, 209 U.S. 123 (1908)). Here, no evidence substantiates his

claim that he remains at any substantial risk of serious harm while confined in NMCD. In

response to information about Harvin's assault and his correspondence complaining of being

attacked and unsafe at NMCD, Connecticut ICO staff contacted NMCD staff and confirmed that

Harvin had been separated from his attackers, a separation profile was put in place, and Harvin

was moved to a new facility where he has not presented any management problems other than

some disciplinary issues.[19]  Defs.' L.R. at ¶¶ 80-96. No evidence in the record supports an

---

[19]  Harvin submits a NMCD misconduct report describing his fight with another inmate on May 2, 2024.
Pl.'s Opp. at 122. The report indicates that video footage showed Harvin and the other inmate fighting in

inference that NMCD staff is not capable of keeping Harvin safe.

Thus, the Court grants the motion for summary judgment on Harvin's Eighth Amendment claims for deliberate indifference to his risk of harm from his NMCD confinement against Commissioner Quiros and Captain Papoosha in their individual and official capacities.

### 2.    Eighth Amendment Excessive Force

Harvin is proceeding on claims of Eighth Amendment excessive force against Lieutenant Cheney (for spraying him in the face with a chemical agent) and against Lieutenant McDonald (for failing to intervene). *See* IRO at 9.

The Eighth Amendment protects against punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). An inmate alleging excessive force in violation of the Eighth Amendment has the burden of establishing both an objective and a subjective component of his claim. *Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000); *see also Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).

The objective component of an Eighth Amendment claim focuses "on the harm done; but the amount of harm that must be shown depends on the nature of the claim." *Sims*, 230 F.3d at 21. The core judicial inquiry with respect to the objective component does not concern the relative level of injury sustained but rather "the nature of the force—specifically, whether it was nontrivial," and with respect to the subjective component depends on whether it "was applied maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010). As the Supreme Court has explained, not "every malevolent touch by a prison guard gives rise to a

---

the cell for a few minutes until the other inmate exited the cell, got into the shower, and then Harvin began to sweep the floor with other inmates. *Id.* The report explains that Harvin was later placed in the RHU pending 24-hour review of the incident. *Id.* This evidence fails, however, to raise an inference that Harvin remains at serious risk of harm or that NMCD cannot take sufficient measures to ensure his safety.

federal cause of action." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."). As an objective matter, *de minimis* use of force is generally insufficient to constitute an Eighth Amendment violation except where that force is of a kind that is "repugnant to the conscience of mankind." *Wilkins*, 559 U.S. at 37–38. "The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016). A plaintiff may satisfy the subjective component of the Eighth Amendment test by showing that "no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct," as the mistreatment alone may, "in some circumstances, be sufficient evidence of a culpable state of mind." *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997).

No evidence supports an inference that Lieutenant Cheney acted maliciously or sadistically when he applied the chemical agent. Instead, the record demonstrates that Lieutenant Cheney applied only one burst of chemical agent in order to end an inmate physical alteration and gain control over an unstable situation in the SRG Unit.

No reasonable jury could determine after review of the present record that Lieutenant Cheney applied single burst of chemical agent for any malicious purpose or without a legitimate penological purpose. Accordingly, the derivative failure to intervene claim against Lieutenant McDonald also fails as a matter of law. Alternatively, Defendants are entitled to qualified

44

immunity as a reasonable officer would not have known that he was violating the Eighth Amendment under similar circumstances.

The Court grants the motion for summary judgment on the Eighth Amendment excessive force claims against Lieutenants Cheney and McDonald.

### 3.    State Law Recklessness Claims

The Court permitted Harvin to proceed on his claims of recklessness arising from plausible Eighth Amendment excessive force and deliberate indifference claims. The Court has now denied the motion for summary judgment on Harvin's Eighth Amendment claims against Lieutenant Cheney, Captain Roy, Counselor Supervisor Stanley, Correction Officer Brysgel for deliberate indifference to his substantial risk of serious harm arising from being housed in the same cell as Inmate 1, and on his Eighth Amendment claim against Officer Nguyen for his deliberate indifference to Harvin's substantial risk of serious harm from Inmate 1's assault on September 3, 2021.

The district court has discretion to retain or decline supplemental jurisdiction over a state law claim asserted against a defendant who has no federal claims pending against him. *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004) (noting that the court can exercise supplemental jurisdiction over a state law claim even if "asserted against a party different from the one named in the federal claim" but "[t]he fact that the district court has the power to hear these supplemental claims does not mean, of course, that it must do so. Instead, it may decline to exercise its power based on the factors laid out in 28 U.S.C. § 1367(c)."); *Kaplan v. County of Orange*, 528 F. Supp. 3d 141, 160–61 n.6 (S.D.N.Y. 2021) (declining to

exercise jurisdiction over state law claims against certain defendants against whom no federal claims were pending; discussing discretion to do so; and collecting cases).

At this point, there are no pending Eighth Amendment excessive force claims against any Defendants, and there are no Eighth Amendment deliberate indifference claims pending against Lieutenant McDonald, Warden Barone, Captain Papoosha, or Commissioner Quiros. Accordingly, the Court declines to exercise supplemental jurisdiction over the state law claims for recklessness against Lieutenant McDonald, Warden Barone, Captain Papoosha, and Commissioner Quiros pursuant to 28 U.S.C. § 1367(c). *Jean-Baptiste v. Froehlich*, 2024 WL 4581653, at *7 (D. Conn. Oct. 25, 2024) (declining supplemental jurisdiction over state claims against defendants after granting summary judgment on all federal claims against those defendants, but retaining supplemental jurisdiction over state law claim against remaining defendant with pending federal claim).

The Court will retain supplemental jurisdiction over the state law claims of recklessness against Lieutenant Cheney, Captain Roy, Counselor Supervisor Stanley, Correction Officer Brysgel, and Correction Officer Nguyen.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for summary judgment [ECF No. 84] is GRANTED in part and DENIED in part.

The following claims survive the motion for summary judgment: (1) Eighth Amendment deliberate indifference to Harvin's substantial risk of serious harm arising from his being housed in the same cell with Inmate 1 against Lieutenant Cheney, Captain Roy, Counselor Supervisor Stanley, and Correction Officer Brysgel in their individual capacities; (2) Eighth Amendment

deliberate indifference to his substantial risk of serious harm arising from the assault on September 3, 2021 against Officer Nguyen in his individual capacity; and (3) state law recklessness against Lieutenant Cheney, Captain Roy, Counselor Supervisor Stanley, Correction Officer Brysgel, and Correction Officer Nguyen. The Court enters summary judgment on all other federal claims, including all federal claims against Captain Papoosha, Commissioner Quiros, Lieutenant McDonald, Warden Barone, District Administrator Guadarrama, and ARC Bennett.

The Court declines supplemental jurisdiction over Harvin's state law claims of recklessness against Lieutenant McDonald, Warden Barone, Captain Papoosha, and Commissioner Quiros. These state law claims are dismissed without prejudice.

**SO ORDERED** this 6th day of June 2025, at Hartford, Connecticut.


_____/s/_____
Michael P. Shea
United States District Judge